**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HERITAGE BANK, INC., <br> as assignee of TANDEM BANK, <br> <br>                          Plaintiff, <br>    v. <br> <br> P/E CAPITAL INVESTMENT <br> MANAGEMENT PARTNERS, ELISEO JOJO <br> PRISNO, AND CANDY PRISNO <br> <br>                         Defendants. | ) <br> ) <br> ) <br> ) <br> )   Case No. <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**<u>COMPLAINT</u>**

Plaintiff Heritage Bank, Inc., by and through its attorneys, Schoenberg Finkel Beederman Bell Glazer, LLC, for its Complaint against P/E Capital Investment Management Partners, Eliseo Jojo Prisno and Candy Prisno, states as follows:

**PARTIES**

1.  Plaintiff Heritage Bank, Inc. ("Heritage") is a Kentucky corporation with a principal place of business at 4155 Lafayette Road, Hopkinsville, Kentucky 42240. Heritage is a citizen of Kentucky.

2.  Defendant Eliseo Jojo Prisno ("Eliseo"), an individual, is a citizen of Illinois.

3.  Defendant Candy Prisno ("Candy"), an individual, is a citizen of Illinois.

4.  Defendant P/E Capital Investment Management Partners ("P/E Capital") is an Illinois general partnership. P/E Capital's sole partners are Eliseo Jojo Prisno and Candy Prisno. *See* Exhibit A attached hereto. P/E Capital is a citizen of Illinois.

**JURISDICTION AND VENUE**

5.  This Court has subject matter jurisdiction through diversity of citizenship pursuant to 28 U.S.C. § 1332. The parties are completely diverse since Heritage is a citizen of Kentucky,

and Defendants are citizens of Illinois. The amount in controversy exceeds $75,000, as the amounts due under the promissory note at issue are no less than $140,613.25, plus interest, late charges and attorneys' fees and costs.

6.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because: (i) all of the Defendants reside in the State in which this judicial district is located, and (ii) a substantial part of the events or omissions giving rise to this Complaint occurred within this judicial district.

## FACTUAL BACKGROUND

7.    P/E Capital obtained a U.S. Small Business Administration loan from Tandem Bank, a Georgia corporation, in the amount of $150,000.00, in connection with which P/E Capital executed a promissory note dated December 12, 2023 ("Note"), a true and correct copy of which is attached hereto as Exhibit B.

8.    As security for the payment of the Note, and in further consideration of Tandem Bank loaning money to P/E Capital pursuant to the Note, Eliseo and Candy each executed an unconditional guarantee dated December 12, 2023 (collectively, "the Guarantees"), true and correct copies of which are attached hereto as Exhibits C and D.

9.    P/E Capital defaulted on the Note as a result of its failure to make required monthly payments in August and September of 2025. *See* Exhibit B, ¶ 4.

10.    P/E Capital defaulted on the Note as a result of the commencement of a civil enforcement action against it which may materially affect its ability to pay the Note. *Id*., ¶ 4 (K), (M).

11.    On July 3, 2025, the United States Securities Exchange and Commission ("SEC") commenced a civil action entitled *SEC v. Eliseo Jojo Prisno and P/E Capital Investment*

2

*Management Partners*, Case No. 1:25-cv-07491 in the United States District Court for the Northern District of Illinois ("SEC Action").

12.     The SEC Action alleges P/E Capital charged its clients undisclosed and unauthorized fees in excess of $2,400,000.00 and, in addition to civil penalties and disgorgement, seeks to permanently enjoin P/E Capital's violations of the Investment Advisers Act, 15 U.S.C. § 80b-6(1)-(2).  Such injunctive relief would effectively terminate P/E Capital's business operations.

13.     On September 17, 2025, at Docket No. 20 of the SEC Action, the Honorable Judge Jorge L. Alonso entered an order of default pursuant to Federal Rule of Civil Procedure 55(a) against P/E Capital.

14.     The Note empowered Tandem Bank, without notice or demand in the event of default, to require the immediate payment of all amounts due thereunder, to collect such amounts for the borrower or guarantor, and to file suit and obtain judgment.  *See* Exhibit B, at  ¶¶ 5-6.

15.     As of the filing of this Complaint, there is due and owing under the Note the principal balance of $140,613.25, plus accrued interest, default interest, accrued late fees and attorneys' fees and costs.

16.     The Note grants Tandem Bank the right to recoup its costs of collection and enforcement of the promissory notes, guarantees or security agreements incurred as a result of enforcing its rights after an event of default, including attorneys' fees and expenses. *Id*., ¶ 6(B).

17.     By Allonge dated January 18, 2025, Tandem Bank assigned the Note to Heritage. *See* Exhibit E attached hereto.

18.     Tandem Bank and its assignee, Heritage, have materially performed upon all of their obligations under the Note and Guarantees.

19.     Heritage has been damaged as a result of Defendants' breaches of the Note and Guarantees.

### Count I (Breach of the Note)
### Heritage  v. P/E Capital

20.     Heritage incorporates by reference paragraphs 1 through 19 as and for this paragraph 20.

21.     Pursuant to the Note, P/E Capital is liable for the following amounts: (a) unpaid principal balance of $140,613.25, plus accrued interest, default interest, accrued late fees, attorneys' fees and costs, together with any hereafter accrued interest, default interest, late charges, attorneys' fees and costs.

WHEREFORE, Heritage Bank, Inc. requests judgment in its favor against P/E Capital Investment Management Partners: (a) in an amount in excess of $140,613.25, together with interest accruing until the judgment is satisfied, together with associated attorneys' fees and expenses, plus any additional costs and fees; and (b) such additional relief as the Court deems just and appropriate.

**Count II (Breach of Guarantee)**
**Heritage  v. Eliseo Jojo Prisno**

22.     Heritage incorporates by reference paragraphs 1 through 21 as and for this paragraph 22.

23.     P/E Capital is in default under the Note.

24.     Pursuant to the Guarantee, Eliseo immediately owes to Heritage all sums due and owing from P/E Capital under the Note.  Ex. C, ¶ 1.

25.     Pursuant to the Guarantee, Eliseo is liable for the following amounts: (a) unpaid principal balance of $140,613.25, plus accrued interest, default interest, accrued late fees, attorneys' fees and costs, together with any hereafter accrued interest, default interest, late charges, attorneys' fees and costs. *Id*., ¶ 9(a).

WHEREFORE, Heritage Bank, Inc. requests judgment in its favor against Eliseo Jojo Prisno: (a) in an amount in excess of $140,613.25, together with interest accruing until the judgment is satisfied, together with attorneys' fees and expenses incurred in this matter, plus any additional costs and fees; and (b) such additional relief as the Court deems just and appropriate.

**Count III (Breach of Guarantee)**
**Heritage  v. Candy Prisno**

26.     Heritage incorporates by reference paragraphs 1 through 25 as and for this paragraph 26.

27.     P/E Capital is in default under the Note.

28.     Pursuant to the Guarantee, Candy immediately owes to Heritage all sums due and owing from P/E Capital under the Note.  Ex. D, ¶ 1.

29.     Pursuant to the  Guarantee, Candy is liable for the following amounts: (a) unpaid principal balance of $140,613.25, plus accrued interest, default interest, accrued late fees,

attorneys' fees and costs, together with any hereafter accrued interest, default interest, late charges, attorneys' fees and costs. *Id*., ¶ 9(a).

WHEREFORE, Heritage Bank, Inc. requests judgment in its favor against Candy Prisno: (a) in an amount in excess of $140,613.25, together with interest accruing until the judgment is satisfied, together with attorneys' fees and expenses incurred in this matter, plus any additional costs and fees; and (b) such additional relief as the Court deems just and appropriate.

Respectfully Submitted

Heritage Bank, Inc.

*/s/ Jeffery M. Heftman*
One of its attorneys

Jeffery M. Heftman
Jeffery.heftman@sfbbg.com
Schoenberg Finkel
    Beederman Bell Glazer, LLC
300 South Wacker Drive, Ste. 3000
Chicago, IL 60603
Tel: (312) 641-2300

# EXHIBIT A

# OPERATING AGREEMENT

## OF

## P/E Capital Investment Management Partners also known as

## P/E Capital Investments

THIS OPERATING AGREEMENT (the "Agreement"), dated as of 1st of August 2014 (the "Effective Date"), Eliseo Jojo L. Prisno CRPC, MS and Candy L. Emnas-Prisno   hereinafter may be collectively referred to as the "General Partners" or each individually as "Partners" of P/E Capital Investment Management Partners, an Illinois "General Partnership" entity (the "Firm"). also known as or doing business as (DBA) P/E Capital Investments.

## RECITALS:

WHEREAS, the Firm will effectively operate as a State Registered Investment Advisory Firm on August 1, 2014, with Eliseo Jojo L. Prisno CRPC, MS as the resident Principal and Investment Advisor; and

WHEREAS, the Partners will be the Owners and Managers of the Firm and

WHEREAS, the Partners desire that the Firm be treated as a General Partnership for tax purposes under the Internal Revenue Code and

WHEREAS, the Partners further desire to provide for certain rights and obligations relating to the Firm and their ownership thereof;

NOW, THEREFORE, the parties hereto agree as follows:

**1.**     **Purpose.**  The Partners have formed the Firm to be a State Registered Investment Advisory Firm to manage separate account investments of clients under the Firm's Investment Management Division and operate an insurance agency under the Firm's Insurance Solutions Division and to do all things incident thereto or to conduct such business and operations as otherwise agreed upon by the Partners as provided for herein. In addition, the Firm may do any / all things which are permitted to be done by State Registered Investment Advisors or other applicable laws.

**2.**     **Revenue Generation.** The Firm will have four main revenue streams:

(a)     Separate Account Management Fees; P/E Capital Investment will peg Advisory Fees on Separate Accounts held in the Firm's trading portal (E*Trade Securities / Interactive Broker). Advisory Fees is subject to agreed pricing with Private Clients and to be stated in the ADV service agreement.

(b)  Fund of Funds Account Management Fees from AMERITAS Investments. P/E Capital Investments, as an accredited separate account programmer of AMERITAS with AUA (Assets Under Advise) reimbursement of 175 basis points (1.75%) yearly will capture AUA reimbursement fees as Advisory Revenues. AUA reimbursement will be based on the formula as follows: Quarterly AUA Fee = Account Value Ending the Calendar Quarter X (no. of days of the quarter / 365 days) X 0.0175

(c)  Insurance Agency Revenues. P/E Capital Investments' Insurance Division will function as an independent insurance agency initially working with an FMO (Field Marketing Office) but eventually will established itself as a direct carrier FMO. Eliseo Jojo L. Prisno CRPC, MS will function as the direct appointee of selected insurance carriers. The Division will capture 100% of all payouts including but not limited to sales commissions, marketing reimbursements from carriers and FMO's, trails, renewal fees and bonuses. The Division's revenue will be captured as a revenue stream of the Firm net of affiliated agent's pay-out.

(d)  Business Process Outsourcing. The Firm will establish a Philippine subsidiary P/E Capital Investment Holdings (PHILIPPINES), Inc. an out-sourcing outfit that will focus on telemarketing of investment and insurance carrier products, financial services back office management and leads generation services for independent agents and advisors affiliated to the Firm. The BPO subsidiary will function as the FMO support service for independent insurance agents and advisors attached or affiliated to the Firm. All revenues net of Philippine operations will be captured as the Firm's "Other" revenue sources.

## 3.  **Trading Operations of Separate Accounts and Fund of Funds Program:**

The trading activities of the firm will be executed by the Resident Principal and Investment Advisor Eliseo Jojo L. Prisno and Candy L. Emnas-Prisno ("Traders"). The trading activities will cover all (E*Trade Securities / Interactive Broker) separate accounts and the Master Account of the Fund of Funds with Ameritas. The Traders has the discretion to set up the separate accounts with (E*Trade Securities / Interactive Broker) on margin if the separate accounts are non-qualified accounts. The maximum margin separate accounts may be exposed to is up to 100%. The "Traders" may also execute Options Trading at its discretion on (E*Trade Securities / Interactive Broker) separate accounts on both qualified and non-qualified monies.

## 4.  **Trading and Investing in Partnership Account / Firm's Account (Options and on Margin):**

The investing activities of the firm in its partnership account will be executed by the Resident Principal and Investment Advisor Eliseo Jojo L. Prisno. The Investment Advisor has the discretion on what to invest in and the investing / trading strategy to be employed. The Investment and Trading account can engage in Options trading (Covered Calls and Put / Call Spreads) and can be enrolled on margin up to a maximum of 4 times of the invested principal.

**5.**     **Compensation of Partners.** The Partners will be compensated in a manner directly equated to the actual revenue streams booked by the Firm from the Partners' personal production. The Partners may work as a team and the revenue derived from the team effort will be recognized as pooled revenue and will be paid out to the producing Partners as a shared unit.

**6.**     **Capital Contributions.**

(a)     Capital Contributions. Each Partner will update the capital contribution to the Firm as set forth on Exhibit A. No interest shall be paid on any capital contribution by a Partner, except as otherwise provided in this Agreement,

When emergency cash will be needed to cover contingencies or to cover fund gaps beyond the updated cash flow forecast, the Partners should provide their proportionate share of the requirement based on ownership of the business (no consultation needed). If any Partner is unable to provide his or her share, the other Partner may agree to put in additional funds to cover the full requirement. Additional funds put in that is not matched according to the ownership structure will earn an interest rate at par with the best rate currently available to the Firm at the transfer of the advance. The cash advance and the interests of this unmatched cash advance will be reimbursed during the calendar year as soon as the Firm cash flow permits.

(b)     Additional Capital Contributions. If, at any time after the date hereof, all the Partners agree that additional capital contributions are required to further the purposes of the Firm, then each Partner will be given at least thirty (30) days to contribute a portion of the amount of additional capital. The percentage of the additional capital to which each Partner shall be entitled to subscribe shall be equal to a fraction of the total capital, the numerator of which shall equal the total capital then held by the Partners, and the denominator of which shall equal the then aggregate outstanding capital.

(c)     Partner Loans. Any Partner, at any time, may make a loan to the Firm in any amount and upon those terms which the Partners agree. Notwithstanding anything contained herein, no Partner shall be required to make a loan to the Firm after the date hereof. If the Partners determine that the Firm required additional funds, any Partner may, but shall not be obligated to, advance such funds. Interest and similar charges or fees for loans or other advancements made by a Partner may equal but not exceed the amount which would be charged by unrelated lending institutions on comparable loans for the same purpose in Chicago, Illinois, as determined in good faith by the Partners. No Partner is required to loan the Firm more than $100,000.00 in the aggregate at any one time.

7.      **Allocations; Distributions.**

(a)      The Firm shall maintain a "Tax Basis Capital Account" for each Partner to reflect such Partner's interest in the Firm determined with respect to the adjusted basis for tax purposes of Firm assets and in connection therewith shall maintain a set of books and records (the "Tax Basis Books") in accordance with the principles of federal income tax accounting.

(b)      After giving effect to the special allocation provisions set forth below, Profits and Losses shall be allocated among the Partners in proportion to their respective ownership.

(c)      The following special allocations shall be made in the following order:

(i.) <u>Minimum Gain Chargeback</u>.  If there is a net decrease in minimum gain, as such term is used in Regulation § 1.704-2(d), for a Firm taxable year, then the Partners shall be allocated items of income and gain in accordance with Regulation §1.704-2(f).  This subsection (i) is intended to comply with the minimum gain chargeback requirement in such section of the Regulations and shall be interpreted consistently therewith.

(ii.) <u>Partner Loan Minimum Gain Chargeback</u>.  If there is a net decrease in minimum gain attributable to non-recourse liability, as set forth in Regulation Section § 1.704-2(i), for a taxable year, then any Partner with ownership of such minimum gain shall be allocated items of Firm income and gain in accordance with such regulation.

(iii.) <u>Qualified Income Offset</u>.  If a Partner unexpectedly receives any adjustment, allocation, or distribution, described in Regulation §1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of income and gain shall be specially allocated to such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible.

(iv.) <u>Non-recourse Deductions</u>.  Non-recourse deductions, as such term is used in Regulation § 1.704-2(c), for any fiscal year or other period shall be specially allocated among the Partners in proportion to their respective ownership.

(v.) <u>Partner Non-Recourse Deduction</u>.  Any deduction attributable to non-recourse deductions, as such terms is defined in Regulation § 1.70402(i)(2), for any fiscal year or other period shall be specially allocated to the Partner who bears the risk of loss with respect to the liability to which such non-recourse deductions are attributable in accordance with Regulation § 1.704-2(i)(1).

(vi.) <u>Curative Allocations</u>.  The allocations set forth herein (the "Regulatory Allocations") are intended to comply with certain requirements of Regulation § 1.704-1(b).  Notwithstanding any other provision of this Section, the Regulatory Allocations shall be taken into account in allocating other Profits, Losses and items of income, gain, loss and deduction among Partners so that, to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Regulatory Allocations had not been taken into account.

With respect to property of the Firm that is in the Firm's Section 704 Books at a value that differs from the value of such property as reflected in the Firm's Tax Basis books, allocations of income, gain, loss and deduction with respect to such property shall be shared among the Partners in a manner that takes into account the variations between the Tax Basis Book value of such property and the Section 704 Book value of such property in the same manner as variations between the adjusted tax basis and fair market value of property contributed to a partnership are taken into account in determining a partner's share of tax items under Code Section 704(c).

(d)      Distributable Cash Flow from the operation of the Firm shall be calculated quarterly and distributed to the Partners not later than thirty (30) days after the end of each quarter.  Distributable Cash Flow shall be allocated among and distributed to the Partners in the following order and priority: (i) First, to the Partners in such amount as is necessary for each Partner to pay any income tax imposed **because** of his ownership assuming the highest marginal Federal, State and local tax rates (the "Tax Distribution") and (ii) to the Partners in proportion to their respective ownership.

(e)      As used herein: (i) "Profits" and "Losses" shall mean, for each calendar year or other period, an amount equal to the Firm's taxable income or loss for such year or period, determined in accordance with applicable sections of the Code; (ii) "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provisions of succeeding law; and (iii) "Distributable Cash Flow" shall mean cash funds from Firm's operations without deduction for depreciation, but after deducting cash funds used to pay all other expenses, debt payments, obligations, capital improvements and replacements and after deducing additional cash funds in such amounts that the Partners determines are appropriate to retain as a reserve for contingencies; provided that in all events, Distributable Cash Flow shall equal the aggregate Tax Distribution.

## 8.      <u>Transfer of Firm Interest</u>.

(a)      No Partner shall transfer its ownership or its interest in the Firm, or any portion thereof, to any person, firm or corporation except with the prior written consent or approval of the other Partner.

(b)      No Partner may pledge or any way encumber its interest in the Firm, or any portion thereof, to any person, firm or corporation, except with the prior written consent or approval of the other Partner, and upon such consent, any such pledge or encumbrance shall allow the recipient the right to receive distributions only but shall not affect such Partner's obligations hereunder and shall not grant the recipient any rights hereunder.

## 9.   **Termination**.

(a)      The Firm shall be dissolved upon the Termination of any Partner,

(b)      As used herein, "Termination" means:

>> (i) a Bankruptcy event;

>> (ii) a Partner who is an individual die or is adjudicated an incompetent;

(c)      As used herein, "Bankruptcy event" means a Partner that does any of the following: (i) makes an assignment for the benefit of creditors; (ii) files a voluntary petition in bankruptcy; (iii) is adjudicated a bankrupt or insolvent; (iv) files a petition or answer in any  arrangement, composition, readjustment, liquidation, dissolution or similar relief proceeding under any law or rule that seeks for itself any of those types of relief; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him or her in any proceeding seeking the relief described in clause (iv) of this subsection (c); (vi) a period of one hundred twenty (12) days has elapsed after the commencement against the Partner of any proceedings seeking the relief described in clause (iv) of this subsection (c), and the proceeding has not been dismissed; (vii) a period of ninety (90) days has elapsed after the appointment of a trustee, receiver, or liquidator for the Partner or for all or any substantial part of his, her or its properties without the other Partner's consent to acquiescence, and the appointment has not been vacated or stayed; or (viii) a period of ninety (90) days has elapsed after the expiration of that stay, and the appointment has not been vacated.

(d)      No Partner shall withdraw or retire in any way be entitled to a return of any part of his capital account without the consent of the other Partner.

## 10.   **Management Matters**.

(a)      Management Rights.

>> (i) The management of the Firm is reserved to the Partners Only.

(ii.) <u>Authority of Partners/Extraordinary Transactions</u>. Except as set forth herein, the Partners shall have the authority to carry on the day-to-day business of the Firm. The Partners may from time to time delegate certain tasks or responsibilities to a Partner. Notwithstanding anything contained herein, the unanimous consent of the Partners shall be required to: (A) sell, lease or mortgage all or substantially all assets or any material asset of the Firm; (B) consummate any merger, reorganization or consolidation involving the Firm; (C) incur any material liability, obligation or expense for or on behalf of the Firm outside the ordinary course of business and not on any budget approved by the Partners; (D) pay, increase or decrease any fee or other remuneration to any Partner or affiliate thereof; (E) enter into any business transaction or other arrangement with any Partner or affiliate thereof; (F) change the purpose of the Firm; (G) open another Investment Firm; (H) admit a new Partner; (I) cause the Firm to issue any additional ownership; (J) to cause the Firm to file for bankruptcy or similar state law insolvency proceedings or to make an assignment for the benefit of creditors (collectively the "Extraordinary Transaction" or each, individually, an "Extraordinary Transaction").

(iii.) <u>Compensation of Partners</u>. Subject to subsection (iv.) below, Partners shall be reimbursed for all expenses reasonably incurred in managing the Firm and may be entitled to compensation in an amount to be determined from time to time by the unanimous approval of the Partners.

(iv). Chief Operating Officer (COO); The Partners may from time to time appoint and/or remove a party who may or may not be a Partner to serve as the Chief Operating Officer to manage and oversee the day-to-day operations of the Firm and perform the functions otherwise forth herein to run, facilitate and manage the business of the Firm on a day-to-day basis; provided, however, that the COO shall have no authority to take any action requiring the unanimous consent of the Partners. The compensation payable to the COO shall be determined by the consent of the Partners. The Partners hereby agree **that Candy L. Emnas-Prisno be the Chief Operating Officer of the Firm.**

(c)    <u>Outside Interests</u>. Each Partner shall be free to pursue and own other ventures if such ventures do not compete with the Firm and without any obligation to present any such opportunity to the Firm or other Partner, and neither the Firm nor the other Partner shall have any interest therein, or any claim against such other Partner, solely because of their interest in the Firm. Each Partner shall be free to devote such time and efforts to such outside ventures, and to allocate its time between the Firm and such outside ventures, as he deems appropriate.

**10.    Financial Reports and Tax Returns.** The Partners shall prepare or have prepared, within ninety (90) days after the end of the Firm's fiscal year: (i) complete financial statements of the Firm including a balance sheet as of the end of such year and a profit loss statement for such year; and (ii) such information and reports shall enable each

Partner to comply with all federal, state and local income tax laws and reporting requirements applicable to each Partner.

**11.**     **Records.**  The Partners shall have access to Firm records at all reasonable times on reasonable prior notice for evaluating or protecting their investment in the Firm or to obtain information necessary to comply with legal obligations.

**12.**     **Modifications.**  This Agreement may be amended only upon the written consent of the Partners.

**13.**     **Captions**.  Captions are included for convenient reference only and shall not affect the interpretation of any provision of this Agreement.

**14.**     **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, and shall be entered in the record of minutes of the proceedings of the General Partners of the Firm.

IN WITNESS WHEREOF, each Partner and the Firm have executed this Agreement effective as of the Effective Date.

**Partners:**

_____
**Candy L. Emnas-Prisno**

_____
**Eliseo Jojo L. Prisno CRPC, MS**

## INDIVIDUAL ACKNOWLEDGMENT

State/Commonwealth of _____ _ĪĿ_____ }

County of _____ _Cook_____ } ss.

On this the __30th__ day of __Ocioam__ , __2018__ , before me,
 Day  Month  Year

_____Regnald Lomax_____ , the undersigned Notary Public,
 *Name of Notary Public*

personally appeared __Cary L. Emmons-Peiswo & Elisuo Jojo Peiswo__ ,
 *Name(s) of Signer(s)*

☐ personally known to me **– OR –**

☒ proved to me on the basis of satisfactory
 evidence

to be the person(s) whose name(s) is/are subscribed
to the within instrument, and acknowledged to
me that he/she/they executed the same for the
purposes therein stated.

WITNESS my hand and official seal.

_____

 *Signature of Notary Public*

_____

OFFICIAL SEAL
REGINALD LOMAX
Notary Public - State of Illinois
My Commission Expires Apr 30, 2019

_____

 *Any Other Required Information*
 *(Printed Name of Notary, Expiration Date, etc.)*

*Place Notary Seal/Stamp Above*

———————— **OPTIONAL** ————————

*This section is required for notarizations performed in Arizona but is optional in other states. Completing this
information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: ___Opsuanjg Agguemas1_____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827) Item #25936

M1304-07 (09/17)

# EXHIBIT B

DocuSign Envelope ID: E77E0E43-F864-4CCG-8665-98D38B071C42



## U.S. Small Business Administration

# NOTE

U.S. Small Business
Administration

| SBA Loan # | **5392669106** |
|---|---|
| SBA Loan Name | **P/E Capital Investments** |
| Approval Date | **September 27, 2023** |
| Date | **December 12, 2023** |
| Loan Amount | **$150,000.00** |
| Interest Rate | **Prime plus 3.75%** |
| Borrower | **P/E Capital Investments** |
| Operating Company | **P/E Capital Investments** |
| Lender | **Tandem Bank** |

1. PROMISE TO PAY:

   In return for the Loan, Borrower promises to pay to the order of Lender the amount of **One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00)**, interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

   "Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

   "Guarantor" means each person or entity that signs a guarantee of payment of this Note.

   "Loan" means the loan evidenced by this Note.

   "Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

   "SBA" means the Small Business Administration, an Agency of the United States of America.

3. PAYMENT TERMS:

   Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

   > **Maturity**:  This Note will mature in 10 years from date of Note.
   >
   > **Repayment Terms**:
   >
   > > The interest rate on this Note will fluctuate. The initial interest rate is 12.25% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 3.75%. The initial interest rate must remain in effect until the first change period begins unless reduced in

accordance with SOP 50 10.

Borrower must pay principal and interest payments of $2,173.80 every month beginning one (1) month from the month this Note is dated; payments must be made on the fifth (5th) calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted every calendar quarter (the "change period").

The date of the first interest rate adjustment will be January 1, 2024.

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 3.75% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The spread identified in the Note may not be changed during the life of the Loan without the written consent of the Borrower.

For variable rate loans, the interest rate adjustment period may not be changed without the written consent of the Borrower.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

The interest rate identified in the Note may not be changed during the life of the loan unless changed in accordance with SOP 50 10.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

    a.   Give Lender written notice;

    b.   Pay all accrued interest; and

    c.   If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under b. of this paragraph.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 10 years from date of Note.

**Late Charge:** If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

4.  DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

DocuSign Envelope ID: E7ZE0E43-F864-4CCC-8665-98D38B071C42

A.     Fails to do anything required by this Note and other Loan Documents;

B.     Defaults on any other loan with Lender;

C.     Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D.     Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E.     Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F.     Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G.     Fails to pay any taxes when due;

H.     Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I.     Has a receiver or liquidator appointed for any part of their business or property;

J.     Makes an assignment for the benefit of creditors;

K.     Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L.     Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M.     Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5.   LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.     Require immediate payment of all amounts owing under this Note;

B.     Collect all amounts owing from any Borrower or Guarantor;

C.     File suit and obtain judgment;

D.     Take possession of any Collateral; or

E.     Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6.   LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.     Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B.     Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C.     Release anyone obligated to pay this Note;

D.     Compromise, release, renew, extend or substitute any of the Collateral; and

E.     Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7.   WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing

liens, and other purposes.  By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability.  As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.  SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.  GENERAL PROVISIONS:

A.   All individuals and entities signing this Note are jointly and severally liable.

B.   Borrower waives all suretyship defenses.

C.   Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.   Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.   Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.   If any part of this Note is unenforceable, all other parts remain in effect.

G.   To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor.  Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10.  STATE-SPECIFIC PROVISIONS:

| |
|---|
| **N/A** |

11.  BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

**BORROWER:**

**P/E CAPITAL INVESTMENTS**

By: _____
F14E6E3BF5840F5, General Partner

By: _____
Crandy Prisno, General Partner

# EXHIBIT C



U.S. Small Business Administration

# UNCONDITIONAL GUARANTEE

| SBA Loan # | **5392669106** |
|---|---|
| SBA Loan Name | **P/E Capital Investments** |
| Guarantor | **Eliseo Prisno** |
| Borrower | **P/E Capital Investments** |
| Lender | **Tandem Bank** |
| Date | **December 12, 2023** |
| Note Amount | **$150,000.00** |

1. GUARANTEE:

   Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor must pay all amounts due under the Note when Lender makes written demand upon Guarantor. Lender is not required to seek payment from any other source before demanding payment from Guarantor.

2. NOTE:

   The "Note" is the promissory note dated **December 12, 2023** in the principal amount of **One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00)**, from Borrower to Lender. It includes any assumption, renewal, substitution, or replacement of the Note, and multiple notes under a line of credit.

3. DEFINITIONS:

   "Collateral" means any property taken as security for payment of the Note or any guarantee of the Note.

   "Loan" means the loan evidenced by the Note.

   "Loan Documents" means the documents related to the Loan signed by Borrower, Guarantor or any other guarantor, or anyone who pledges Collateral.

   "SBA" means the Small Business Administration, an Agency of the United States of America.

4. LENDER'S GENERAL POWERS:

   Lender may take any of the following actions at any time, without notice, without Guarantor's consent, and without making demand upon Guarantor:

A.  Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

B.  Refrain from taking any action on the Note, the Collateral, or any guarantee;

C.  Release any Borrower or any guarantor of the Note;

D.  Compromise or settle with the Borrower or any guarantor of the Note;

E.  Substitute or release any of the Collateral, whether or not Lender receives anything in return;

F.  Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

G.  Bid at or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

H.  Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

5.  FEDERAL LAW:

When SBA is the holder, the Note and this Guarantee will be construed and enforced under federal law, including SBA regulations.  Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability.  As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

6.  RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES:

To the extent permitted by law,

A.  Guarantor waives all rights to:
1)  Require presentment, protest, or demand upon Borrower;
2)  Redeem any Collateral before or after Lender disposes of it;
3)  Have any disposition of Collateral advertised; and
4)  Require a valuation of Collateral before or after Lender disposes of it.

B.  Guarantor waives any notice of:
1)  Any default under the Note;
2)  Presentment, dishonor, protest, or demand;
3)  Execution of the Note;
4)  Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
5)  Any change in the financial condition or business operations of Borrower or any guarantor;
6)  Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
7)  The time or place of any sale or other disposition of Collateral.

C.  Guarantor waives defenses based upon any claim that:
1)  Lender failed to obtain any guarantee;
2)  Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;
3)  Lender or others improperly valued or inspected the Collateral;
4)  The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;
5)  Lender impaired the Collateral;

6)      Lender did not dispose of any of the Collateral;

7)      Lender did not conduct a commercially reasonable sale;

8)      Lender did not obtain the fair market value of the Collateral;

9)      Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;

10)     The financial condition of Borrower or any guarantor was overstated or has adversely changed;

11)     Lender made errors or omissions in Loan Documents or administration of the Loan;

12)     Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor;

13)     Lender impaired Guarantor's suretyship rights;

14)     Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;

15)     Borrower has avoided liability on the Note; or

16)     Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

## 7. DUTIES AS TO COLLATERAL:

Guarantor will preserve the Collateral pledged by Guarantor to secure this Guarantee. Lender has no duty to preserve or dispose of any Collateral.

## 8. SUCCESSORS AND ASSIGNS:

Under this Guarantee, Guarantor includes heirs and successors, and Lender includes its successors and assigns.

## 9. GENERAL PROVISIONS:

A.     ENFORCEMENT EXPENSES. Guarantor promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B.     SBA NOT A CO-GUARANTOR. Guarantor's liability will continue even if SBA pays Lender. SBA is not a co- guarantor with Guarantor. Guarantor has no right of contribution from SBA.

C.     SUBROGATION RIGHTS. Guarantor has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D.     JOINT AND SEVERAL LIABILITY. All individuals and entities signing as Guarantor are jointly and severally liable.

E.     DOCUMENT SIGNING. Guarantor must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

F.     FINANCIAL STATEMENTS. Guarantor must give Lender financial statements as Lender requires.

G.     LENDER'S RIGHTS CUMULATIVE, NOT WAIVED. Lender may exercise any of its rights separately or together, as many times as it chooses. Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H.     ORAL STATEMENTS NOT BINDING. Guarantor may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I.     SEVERABILITY. If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J.      CONSIDERATION.  The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

10.  STATE-SPECIFIC PROVISIONS:

> **N/A**

11.  GUARANTOR ACKNOWLEDGMENT OF TERMS.

Guarantor acknowledges that Guarantor has read and understands the significance of all terms of the Note and this Guarantee, including all waivers.

12.  GUARANTOR NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated as Guarantor under this Guarantee.

DocuSigned by:

_____

**Eliseo Trisno**, individually

# EXHIBIT D

DocuSign Envelope ID: E77E0E43-F864-4CCG-8665-98D38B071C42



U.S. Small Business Administration

# UNCONDITIONAL GUARANTEE

| SBA Loan # | **5392669106** |
|---|---|
| SBA Loan Name | **P/E Capital Investments** |
| Guarantor | **Candy Prisno** |
| Borrower | **P/E Capital Investments** |
| Lender | **Tandem Bank** |
| Date | **December 12, 2023** |
| Note Amount | **$150,000.00** |

1. GUARANTEE:

   Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor must pay all amounts due under the Note when Lender makes written demand upon Guarantor. Lender is not required to seek payment from any other source before demanding payment from Guarantor.

2. NOTE:

   The "Note" is the promissory note dated **December 12, 2023** in the principal amount of **One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00)**, from Borrower to Lender. It includes any assumption, renewal, substitution, or replacement of the Note, and multiple notes under a line of credit.

3. DEFINITIONS:

   "Collateral" means any property taken as security for payment of the Note or any guarantee of the Note.

   "Loan" means the loan evidenced by the Note.

   "Loan Documents" means the documents related to the Loan signed by Borrower, Guarantor or any other guarantor, or anyone who pledges Collateral.

   "SBA" means the Small Business Administration, an Agency of the United States of America.

4. LENDER'S GENERAL POWERS:

   Lender may take any of the following actions at any time, without notice, without Guarantor's consent, and without making demand upon Guarantor:

A.  Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

B.  Refrain from taking any action on the Note, the Collateral, or any guarantee;

C.  Release any Borrower or any guarantor of the Note;

D.  Compromise or settle with the Borrower or any guarantor of the Note;

E.  Substitute or release any of the Collateral, whether or not Lender receives anything in return;

F.  Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

G.  Bid or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

H.  Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

5.  **FEDERAL LAW:**

When SBA is the holder, the Note and this Guarantee will be construed and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

6.  **RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES:**

To the extent permitted by law,

A.  Guarantor waives all rights to:
1)  Require presentment, protest, or demand upon Borrower;
2)  Redeem any Collateral before or after Lender disposes of it;
3)  Have any disposition of Collateral advertised; and
4)  Require a valuation of Collateral before or after Lender disposes of it.

B.  Guarantor waives any notice of:
1)  Any default under the Note;
2)  Presentment, dishonor, protest, or demand;
3)  Execution of the Note;
4)  Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
5)  Any change in the financial condition or business operations of Borrower or any guarantor;
6)  Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
7)  The time or place of any sale or other disposition of Collateral.

C.  Guarantor waives defenses based upon any claim that:
1)  Lender failed to obtain any guarantee;
2)  Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;
3)  Lender or others improperly valued or inspected the Collateral;
4)  The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;
5)  Lender impaired the Collateral;

6)     Lender did not dispose of any of the Collateral;

7)     Lender did not conduct a commercially reasonable sale;

8)     Lender did not obtain the fair market value of the Collateral;

9)     Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;

10)    The financial condition of Borrower or any guarantor was overstated or has adversely changed;

11)    Lender made errors or omissions in Loan Documents or administration of the Loan;

12)    Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor;

13)    Lender impaired Guarantor's suretyship rights;

14)    Lender modified the Note terms, other than to increase amounts due under the Note.  If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;

15)    Borrower has avoided liability on the Note; or

16)    Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

## 7. DUTIES AS TO COLLATERAL:

Guarantor will preserve the Collateral pledged by Guarantor to secure this Guarantee.  Lender has no duty to preserve or dispose of any Collateral.

## 8. SUCCESSORS AND ASSIGNS:

Under this Guarantee, Guarantor includes heirs and successors, and Lender includes its successors and assigns.

## 9. GENERAL PROVISIONS:

A.     ENFORCEMENT EXPENSES.  Guarantor promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B.     SBA NOT A CO-GUARANTOR.  Guarantor's liability will continue even if SBA pays Lender.  SBA is not a co- guarantor with Guarantor.  Guarantor has no right of contribution from SBA.

C.     SUBROGATION RIGHTS.  Guarantor has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D.     JOINT AND SEVERAL LIABILITY.  All individuals and entities signing as Guarantor are jointly and severally liable.

E.     DOCUMENT SIGNING.  Guarantor must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

F.     FINANCIAL STATEMENTS.  Guarantor must give Lender financial statements as Lender requires.

G.     LENDER'S RIGHTS CUMULATIVE, NOT WAIVED.  Lender may exercise any of its rights separately or together, as many times as it chooses.  Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H.     ORAL STATEMENTS NOT BINDING.  Guarantor may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I.     SEVERABILITY.  If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J.      CONSIDERATION.  The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

10.  STATE-SPECIFIC PROVISIONS:

**N/A**

11.  GUARANTOR ACKNOWLEDGMENT OF TERMS.

Guarantor acknowledges that Guarantor has read and understands the significance of all terms of the Note and this Guarantee, including all waivers.

12.  GUARANTOR NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated as Guarantor under this Guarantee.

_____

**Candy Prisno**, Individually

# EXHIBIT E

## ALLONGE TO U.S. SMALL BUSINESS ADMINISTRATION NOTE

**THIS ALLONGE TO U.S. SMALL BUSINESS ADMINISTRATION NOTE** is dated as of January 18, 2025, and executed by **TANDEM BANK**, a Georgia bank corporation ("**Assignor**"), in favor of **HERITAGE BANK, INC.**, a Kentucky banking corporation ("**Assignee**"), and is attached to that certain U.S. Small Business Administration Note in the original principal amount of $ 150,000.00 given by P/E Capital Investment Management Partne, an Illinois Limited Partnership, to Assignor and dated December 12, 2023 (the "**Note**").

**PAY TO THE ORDER OF HERITAGE BANK, INC.**, its successors and assigns, without recourse, and without any representations or warranties whatsoever, whether express, implied, or by operation of law, except that Assignor warrants that Assignor is the legal and equitable owner of the Note, with full power and authority to sell and assign the same, and that the Note has not been previously pledged or assigned by Assignor and is owned by Assignor free and clear of liens and encumbrances.

TANDEM BANK, a Georgia bank

By: _____

Name: _MICHAEL T. KELLER_

Title: _EVP - CCO_